IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| EMW WOMEN'S SURGICAL CENTER, P.S.C., on behalf of itself, its staff, and its patients; ERNEST MARSHALL, M.D., on behalf of himself and his patients; ASHLEE BERGIN, M.D., on behalf of herself and her patients; and TANYA FRANKLIN, M.D., on behalf of herself and her patients,<br><br>    Plaintiffs,<br><br> v.<br><br>ANDREW G. BESHEAR, in his official capacity as Attorney General of the Commonwealth of Kentucky; VICKIE YATES BROWN GLISSON, in her official capacity as Secretary of Kentucky's Cabinet for Health and Family Services; and MICHAEL S. RODMAN, in his official capacity as Executive Director of the Kentucky Board of Medical Licensure,<br><br>    Defendants. | **Electronically filed**<br><br>Case No.: 3:17-CV-16-DJH |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

 **I.**  **INTRODUCTION**

 1. Plaintiffs bring this civil rights action, on behalf of themselves and their patients seeking abortions, under the U.S. Constitution and pursuant to 42 U.S.C. § 1983, to challenge the constitutionality of Kentucky House Bill 2 (hereinafter "H.B. 2" or "the Act"), attached hereto as Exhibit A. The Act, which was rushed through the Kentucky Legislature and took immediate

effect less than one week after it was introduced, forces physicians to, *inter alia*, show a woman seeking an abortion ultrasound images of her embryo or fetus, auscultate the heartbeat, and provide a detailed description of the embryo or fetus prior to performing the abortion, even over their patients' objection.

2.     H.B. 2 requires the physician to engage in this state-mandated speech *simultaneous* with the ultrasound procedure itself—in other words, while the woman is partially disrobed, lying on the examination table—regardless of whether the woman wishes to see the images, hear the heartbeat, or hear the description of the fetus.  Indeed, even if the woman objects to any or all of these procedures, and even if the experience is causing the woman emotional and/or psychological distress, the physician must perform the elements required by H.B. 2 against the woman's will.

3.     By so forcibly coopting and perverting the informed consent process, H.B. 2 profoundly intrudes on the practice of medicine and violates basic principles of medical ethics. It forces physicians to deliver a government-mandated, ideological message to patients in violation of the First Amendment, all the while causing harm to their patients.  It also compels women to listen to this government-mandated speech while lying captive on the examination table.  A physician who refuses to subject his or her patient to this speech over the patient's objection is subject to extraordinary monetary penalties and adverse licensing action.

## II.     JURISDICTION AND VENUE

4.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

5.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

6. Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III. PLAINTIFFS

7. Plaintiff EMW Women's Surgical Center, P.S.C. ("EMW"), a Kentucky corporation located in Jefferson County (Louisville), is the sole licensed abortion facility located in Kentucky.  EMW has been providing abortion and reproductive health care to women since the 1980s.  EMW sues on behalf of itself, its staff, and its patients.

8. Plaintiff Ernest Marshall, M.D., is a board-certified obstetrician-gynecologist and co-owner of EMW.  Dr. Marshall has been providing abortions at EMW since the 1980s.  He sues on behalf of himself and his patients.

9. Plaintiff Ashlee Bergin, M.D., is a board-certified obstetrician-gynecologist.  Dr. Bergin provides a range of reproductive health services, including abortions, at EMW.  Dr. Bergin sues on behalf of herself and her patients.

10. Plaintiff Tanya Franklin, M.D., M.S.P.H., is a board-certified obstetrician-gynecologist.  Dr. Franklin provides a range of reproductive health services, including abortions, at EMW.  Dr. Franklin sues on behalf of herself and her patients.

### IV. DEFENDANTS

11. Defendant Andrew G. Beshear is the Attorney General of the Commonwealth of Kentucky and, as such, is the Commonwealth's chief law enforcement officer. Defendant Beshear is sued in his official capacity.

12. Defendant Vickie Yates Brown Glisson serves as Secretary of Kentucky's Cabinet for Health and Family Services ("the Cabinet")—an agency of the Commonwealth of Kentucky with its principal place of business in Franklin County, Kentucky. In her capacity as

Secretary of the Cabinet, Defendant Glisson is charged with, *inter alia*, oversight and licensing of abortion providers and the regulatory enforcement of those facilities.  K.R.S. § 216B.0431(1).  Defendant Glisson is sued in her official capacity.

13.     Defendant Michael S. Rodman serves as Executive Director of the Kentucky Board of Medical Licensure ("KBML" or "the Board"), which is located in Jefferson County.  Defendant Rodman and the Board possess authority to pursue disciplinary action up to and including license revocation against Kentucky physicians.  K.R.S. § 311.565.  Defendant Rodman is sued in his official capacity.

V.      **STATUTORY FRAMEWORK**

Prior Informed Consent Law

14.     Prior to the enactment of H.B. 2, Kentucky law already imposed detailed informed consent requirements on physicians performing, and patients seeking, abortions, beyond those that apply to physicians in all other contexts. K.R.S. § 311.725. These requirements include, among other things, informing the pregnant woman at least twenty-four hours prior to the abortion procedure of: the nature and purpose of the abortion procedure; the medical risks of the abortion; the alternatives to abortion and the risks associated with the alternatives; the probable gestational age of the embryo or fetus; that medical assistance benefits may be available for medical care during pregnancy; and that the father of the embryo or fetus is liable for child support, even if he has offered to pay for the abortion. *Id.* § 311.725(1)(a)-(b).  In addition, she must be told that she has the right to free materials published by the state that detail various forms of medical and other assistance she may be able to receive if she continues the pregnancy. *Id.* § 311.725(1)(b), (2)(a)-(b).

15. Of particular relevance here, she must also be told that state materials to which she is entitled include information about fetal development. These state materials describe, *inter alia*, "the probable anatomical and physiological characteristics of the zygote, blastocyte, embryo, or fetus at two (2) week gestational increments for the first sixteen (16) weeks of her pregnancy and at four (4) week gestational increments from the seventeenth week of her pregnancy to full term," including a "pictorial or photographic description." *Id.* § 311.725(2)(b). Further, "[t]he materials shall also include, in a conspicuous manner, a scale or other explanation that is understandable by the average person and that can be used to determine the actual size of the zygote, blastocyte, embryo, or fetus at a particular gestational increment as contrasted with the depicted size of the zygote, blastocyte, embryo, or fetus at that gestational increment. *Id.* These materials must "use language that is understandable by the average person who is not medically trained, shall be objective and non judgmental, and shall include only accurate scientific information about the zygote blastocyte, embryo, or fetus." *Id.*

16. Under preexisting law, failure to satisfy certain informed consent requirements may be the basis of a disciplinary action against the physician. *Id.* (6).

<u>H.B. 2</u>

17. H.B. 2 was introduced in the Kentucky House of Representatives on Tuesday, January 3, 2017.

18. By Saturday, January 7, 2017, H.B. 2 had been enrolled by both houses of the Kentucky Legislature and delivered to Governor Bevin for his signature. Because the law declared an emergency, it would become immediately effective upon the Governor's signature.

19. Upon information and belief, Governor Bevin has now signed H.B. 2 and, because of the emergency clause, it has taken effect.

20.     H.B. 2 imposes dramatic changes to the existing informed consent framework. However, H.B. 2 contains no legislative findings that there are any inadequacies in the existing protocols for the provision of abortion or informed consent regime.

21.     H.B. 2 dictates that, in addition to satisfying the preexisting informed consent requirements under Kentucky law, a woman cannot provide informed consent to abortion unless and until the physician (or another health care professional designated under the statute) performs an obstetric ultrasound on the woman and:

- Provide[s] a simultaneous explanation of what the ultrasound is depicting, which shall include the presence and location of the unborn child within the uterus and the number of unborn children depicted and also, if the ultrasound image indicates that fetal demise has occurred, inform[s] the woman of that fact;
- Display[s] the ultrasound images so that the pregnant woman may view the images;
- Ascultate[s] (*sic*) the fetal heartbeat of the unborn child so that the pregnant woman may hear the heartbeat if the heartbeat is audible;
- Provide[s] a medical description of the ultrasound images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable.

H.B. 2 § 2(a)-(e).

22.     Other than in the case of medical emergency or medical necessity, which relieves physicians from their obligations under H.B. 2 in very limited circumstances when a woman's health will be severely compromised by a delay in performing the abortion, H.B. 2 contains no

exceptions to the forced display, description, and auscultation requirements.  *Id.* § 5; *see also* K.R.S. § 311.720(12), (13) (defining medical emergency and medical necessity).

23. Although H.B. 2 contains no other exceptions to the physician's obligations under the law, it states that "[w]hen the ultrasound images and heartbeat sounds are provided to and reviewed with the pregnant woman, nothing in this section shall be construed to prevent the pregnant woman from averting her eyes from the ultrasound images or requesting the volume of the heartbeat be reduced or turned off if the heartbeat is audible."  *Id.* § 3.  H.B. 2 is silent as to whether the woman is permitted to refuse to listen to the description of the ultrasound images.

24. H.B. 2 further states that neither the physician nor the pregnant woman "shall be subject to any penalty if the pregnant woman refuses to look at the displayed ultrasound images or to listen to the heartbeat if the heartbeat is audible."  *Id.*  H.B. 2 is silent as to whether any penalty may result if the pregnant woman refuses to listen to the description of the ultrasound images.

25. The penalties for violating H.B. 2 are substantial, including a fine of "not more than one hundred thousand dollars ($100,000) for a first offense and not more than two hundred fifty thousand dollars ($250,000) for each subsequent offense." K.R.S. § 311.990(30)(a).  In addition to the fine, "the court shall report the violation of any physician, in writing, to the Kentucky Board of Medical Licensure for such action and discipline as the board deems appropriate."  *Id.* (30)(b).

## VI. FACTUAL ALLEGATIONS

<u>Medical Ethics and Principles of Informed Consent</u>

26. In providing medical care, healthcare providers have an obligation to comply with standards of medical ethics.

27. Central tenets of the standards of medical ethics provide that the physician may not act upon the patient without her consent (informed consent); that the physician must respect the patient's autonomy; that the physician must act in the patient's best interests; and that the physician must avoid causing unnecessary harm to patients.

28. Respecting patient autonomy requires the health care practitioner to view the patient as someone who can make decisions for herself and to avoid taking action contrary to the wishes of a competent patient.

29. The purpose of the informed consent process is to ensure that the patient's consent consists of an informed and autonomous decision and to respect, to the extent medically appropriate, the individual patient's views about what she wants to do. Informed consent is also a process designed and intended to build trust between a patient and her medical provider.

30. The health care practitioner's role in this process is to provide the patient with information that will allow the patient to make an informed and autonomous choice. This information includes material facts about the nature of the proposed procedure, the procedure's risks and benefits, and alternatives to the procedure (and the risks and benefits thereof). The extent and nature of this information should be tailored to the particular patient's needs and concerns.

31. Patients vary widely in their preferences concerning the level of detail they wish to receive related to a medical condition or intervention and the manner in which the information is communicated to them. Medical images and descriptions are a prime example of this—some patients believe they will benefit from seeing medical images and others do not.

32. In no area of medicine is it necessary for a patient to view medical images from his or her own body in order for the patient to consent to a medical intervention.

Abortion in Kentucky and at EMW

33. Legal abortion is one of the safest procedures in contemporary medical practice, and is substantially safer than childbirth.

34. Women seek abortions for a variety of psychological, emotional, medical, familial, economic, and personal reasons. The majority of women who have abortions already have at least one child. Some women seek abortions because they feel that having an additional child will place too large a strain, economically or emotionally, on their existing family. Some seek abortions because they feel that becoming a parent or having an additional child will interfere with their life goals. Other women seek abortions because the pregnancy resulted from rape or incest. Some women are terminating much wanted pregnancies because they have a medical condition caused, or exacerbated, by the pregnancy that places their health at risk, or because of a fetal diagnosis.

35. Studies have shown that abortion poses little risk of negative psychological consequences or sequelae for women.

36. The vast majority of abortions in Kentucky are performed in the first trimester. The majority of abortions performed at EMW are for women who are nine weeks pregnant or less as measured from their last menstrual period ("LMP").

37. As is the case with any medical procedure, Plaintiffs obtain informed consent from each patient prior to the abortion procedure.

38. Plaintiffs also comply with abortion-specific statutory informed consent requirements, including by making available to the patient, at least twenty-four hours prior to the abortion, illustrated materials that describe the embryo or fetus at different gestational increments.

39. At EMW, all patients undergo an ultrasound prior to the abortion procedure in order for the medical providers to determine the presence of an intrauterine pregnancy and to determine the gestational age of the pregnancy.

40. Patients at EMW have the opportunity to view and ask questions about the ultrasound. However, it is not standard medical practice for abortion providers to display the ultrasound images to patients regardless of whether they want to see them or not, or to put the onus on the patient to "avert her eyes" if she does not want to see the ultrasound; to describe the ultrasound images regardless of whether the patient wants such a description; or to auscultate the fetal heart tones for a patient who does not want to hear them.

Effect of H.B. 2 on Plaintiffs and Their Patients

41. H.B. 2 transforms the patient's opportunity to view her ultrasound and hear the description of its contents, which EMW's patients already have, into a mandate that all patients be shown these images, and be subjected to the description and the heart tones. This is so even if the patient objects and even if in the physician's judgment forcing this experience on a patient will be harmful.

42. H.B. 2 requires physicians to subject their patients to these images, descriptions, and sounds, when the patient is in a particularly vulnerable and exposed position.

43. Prior to nine weeks of pregnancy LMP, when most abortions at EMW are performed, the small size of the embryo or fetus makes it difficult to visualize on the ultrasound. Thus, at that stage of pregnancy the ultrasound is performed using a probe that is inserted through the woman's vagina. This is referred to as a transvaginal ultrasound.

44. In order to perform a transvaginal ultrasound, a woman must lie on her back on an examination table, naked from the waist down, immobilized, with an ultrasound probe inserted into her vagina.

45. After nine weeks, the ultrasound can, in most cases, be performed using an abdominal scanner. This is referred to as a transabdominal ultrasound.

46. During a transabdominal ultrasound, a woman must lie on her back on an examination table, partially undressed, with an ultrasound transducer pressed against her lower abdomen.

47. For some patients, seeing the ultrasound image and hearing the physician describe the embryo or fetus or play the heartbeat will be distressing.

48. This will be particularly true for some women who have become pregnant as a result of sexual assault or who are terminating a wanted pregnancy because of risks to their health or life or because they have learned that the fetus has serious anomalies.

49. H.B. 2 will also likely double the amount of time it takes to perform an ultrasound.

50. Particularly for a woman who requires a transvaginal ultrasound, extending the length of the ultrasound can be emotionally and physically uncomfortable. For victims of sexual assault, it can be traumatic.

51. H.B. 2 also inflicts harms on Plaintiff-physicians.

52. H.B. 2 compels Plaintiff-physicians to speak in order to deliver a state-mandated message.

53. The message H.B. 2 compels physicians to convey is an ideological one.

54.     By forcing a physician to display the ultrasound images to a patient, even over her objection, to provide a detailed description of the embryo or fetus, regardless of whether she wants to hear it, and to auscultate the heart tones, the State is using the physician to send a clear message of disapproval to the physician's patient.

55.     By requiring physicians to display and describe the ultrasound images and auscultate the heartbeat against their patients' wishes, H.B. 2 compels them to speak in a manner that contravenes medical ethics and basic principles of informed consent.

56.     Physicians have an ethical obligation to avoid harming their patients. H.B. 2 forces physicians to defy that ethical obligation by forcing images, descriptions, and heartbeats on patients, even if the patients asks the doctor not to and even when the physician believes that doing so would be distressing or even traumatic for a patient.

57.     H.B. 2 requires that physicians subject their patients to these images, descriptions and sounds even when the patient objects. This violates patient autonomy and the physician's obligation not to act over the objection of a competent patient—a central tenet of ethical medical practice.

58.     H.B. 2 also forces physicians to defy their ethical obligation to exercise individualized medical judgment to provide information at a level of detail and in a manner that respects their patient's wishes and is best suited to their patient's needs.

59.     H.B. 2 harms Plaintiff-physicians by compelling them to speak in a manner that is against their medical judgment and contrary to their patient's best interest.

60.     H.B. 2 harms Plaintiff-physicians by undermining their integrity, offending their consciences, and causing them personal distress.

61.     Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(First Amendment Rights of Physicians)

62. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

63. House Bill 2 violates the rights of Plaintiffs under the First Amendment, as applied through the Fourteenth Amendment, to the U.S. Constitution by forcing them to deliver unwanted, government-mandated speech; in particular, the Act compels physicians to convey to their abortion patients in a private medical setting unwanted government-mandated speech that falls outside accepted and ethical standards and practices for medical informed consent.

### SECOND CLAIM FOR RELIEF
(First Amendment Rights of Patients)

64. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

65. House Bill 2 violates the rights of Plaintiffs' patients by forcing them to submit to unwanted, government-mandated speech, in a context in which they are partially disrobed and immobilized, as a condition of accessing a constitutionally protected medical service, in violation of their right against compelled listening under the First Amendment, as applied through the Fourteenth Amendment, to the U.S. Constitution.

### THIRD CLAIM FOR RELIEF
(Fourteenth Amendment Right to Substantive Due Process)

66. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

67. House Bill 2 violates the right of Plaintiffs and their patients to substantive due process, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, because it is not rationally related to any legitimate government interest.

## FOURTH CLAIM FOR RELIEF
### (Fourteenth Amendment Right to Equal Protection)

68. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

69. House Bill 2 violates the rights of Plaintiffs' patients to equal protection, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, because it subjects women to an unethical informed consent requirement and because it is based on sex-stereotypes about women's decision-making capacity.

## FIFTH CLAIM FOR RELIEF
### (Fourteenth Amendment Right to Bodily Integrity)

70. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

71. House Bill 2 violates the rights of Plaintiffs' patients by forcing them to submit to a physically invasive medical procedure as a condition of accessing a constitutionally protected medical service, in violation of their substantive due process right to privacy and bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

## SIXTH CLAIM FOR RELIEF
### (Fourth Amendment Rights of Patients)

72. The allegations of paragraphs 1 through 61 are incorporated as though fully set forth herein.

73. House Bill 2 violates Plaintiffs' patients' rights under the Fourth Amendment, as applied through the Fourteenth Amendment, to the U.S. Constitution, by subjecting them to an unreasonable, warrantless search and seizure.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

74. Declare House Bill 2 unconstitutional and unenforceable;

75. Enjoin Defendants, their employees, agents, and successors in office from enforcing House Bill 2;

76. Grant Plaintiffs reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

77. Grant such other and further relief as this Court may deem just, proper, and equitable.

Date: January 9, 2017

Respectfully submitted,

/s   William E. Sharp
William E. Sharp, Legal Director
American Civil Liberties Union of Kentucky
315 Guthrie Street, Suite 300
Louisville, Kentucky 40202
(502) 581-9746
(844) 274-0570 (fax)
sharp@aclu-ky.org

Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Andrew Beck*
New York State Bar No. 4740114
Julia Kaye*
New York State Bar No. 5189733
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
abeck@aclu.org
jkaye@aclu.org
(212) 549-2633

*Attorneys for Plaintiffs*

*Motion for pro hac vice to be filed