# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

| | |
|---|---|
| EMW WOMEN'S SURGICAL CENTER, et al., | |
| Plaintiffs, | **Electronically filed** |
| v. | Case No.: 3:17-CV-00016-DJH |
| ANDREW G. BESHEAR, in his official capacity as Attorney General of the Commonwealth of Kentucky, et al., | |
| Defendants. | |

## *AMICUS CURIAE* MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................1

ARGUMENT..........................................................................................................................2

    I.   The Commonwealth of Kentucky has a Compelling and Constitutionally Valid Interest in Protecting Unborn Children. ................................................................2

    II.  House Bill 2 Does Not Infringe Upon the First Amendment Rights of the Plaintiffs. ..............................................................................................................3

    III. Plaintiffs Cannot Satisfy the High Threshold for a Temporary Restraining Order. ..................................................................................................................10

        a.  Plaintiffs Do Not Have a Strong Likelihood of Success on the Merits of the Action....................................................................................................10

        b.  The Movants Will Not Suffer Irreparable Injury Absent the Injunction. ........11

        c.  The Public Interest Will Not Be Served by Issuance of the Injunction. The Public Interest Will, Instead, Be Served by Implementation and Enforcement of the New Law...................................................................................11

CONCLUSION......................................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012) ...................................... 10

*Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir.2001) ...................................................... 10

*Eubanks v. Schmidt*, 126 F.Supp.2d 451 (W.D.Ky.2000) .......................................... 4, 5, 8

*Gonzales v. Carhart*, 550 U.S. 124, 145 (2007) ......................................................... passim

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir.2008) ............................ 10

*Planned Parenthood Minn. v. Rounds*, 530 F.3d 724 (8th Cir.2008) (*en banc*) ........ 8, 9, 10

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992).......... passim

*Stuart v. Camnitz*, 774 F.3d 238 (4th Cir.2014)........................................................... 5, 6, 7

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir.2012) ................................................................................................. 6, 7, 8, 10

*Winger v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ......................................... 10

**Statutes**

H.B. 2, 2017 Gen. Assemb., Reg. Sess. (Ky. 2017) .................................................. passim

Ky. Rev. Stat. § 311.725 ............................................................................................ 3, 4, 11

## INTRODUCTION

On January 9, 2017, Kentucky Governor Matt Bevin signed into law House Bill 2 ("H.B. 2"), passed by the General Assembly, an act requiring that a woman seeking an abortion undergo an ultrasound, be provided the opportunity to see an ultrasound image of the unborn child, and be given specific information about what the ultrasound depicts. H.B. 2, 2017 Gen. Assemb., Reg. Sess. (Ky. 2017). That information shall be provided by the physician who is to perform the abortion, or the physician may delegate the responsibility to a qualified individual. The pregnant woman shall also be given the opportunity to hear the heartbeat of the unborn child. *Id.*

H.B. 2 includes language stating that "nothing in this section shall be construed to prevent the pregnant woman from averting her eyes from the ultrasound images or requesting the volume of the heartbeat be reduced or turned off if the heartbeat is audible." *Id.* The provisions of the bill shall not apply if the pregnant woman is undergoing a medically necessary abortion. Penalties for violating the new law apply only to the physician or qualified technician responsible for providing the ultrasound prior to the abortion. The legislation became effective immediately due to an emergency clause. *Id.*

On January 9, 2017, a Complaint was filed in this Court by EMW Women's Surgical Center, P.S.C. ("EMW") of Louisville and three physicians suing on their own behalf and on behalf of their patients. EMW is a licensed abortion provider. The three plaintiff physicians provide abortions at the EMW facility. Plaintiffs' Complaint, ¶ 7-10.

The Plaintiffs seek: to have H.B. 2 adjudged to be unconstitutional and unenforceable; to enjoin the Defendants from enforcing the law; and attorney's fees, costs, and expenses. *Id.* at ¶ 74-77. The Plaintiffs assert that H.B. 2 violates 1) the First Amendment rights of both abortion-providing physicians and their patients; 2) the substantive due process rights of both the physician and their patients; 3) the patients' right to equal protection, because they are subjected to "an unethical informed consent requirement and because it is based

1

on sex-stereotypes about women's decision-making capacity;" 4) the patients' right to privacy, as the medical procedure is physically invasive; and, 5) the patients' right to be free of an unreasonable, warrantless search and seizure. (*Id.* at ¶ 62-73).

The legal argument in the Plaintiffs' Motion for Temporary Restraining Order focuses upon their "First Amendment Compelled Speech Claim." Plaintiffs' Memorandum, p.12-23. This *amicus* brief will be concentrated primarily on this erroneous argument.

## ARGUMENT

### I. The Commonwealth of Kentucky has a Compelling and Constitutionally Valid Interest in Protecting Unborn Children.

As a preliminary matter, it bears emphasizing that the United States Supreme Court, notwithstanding the rights it has given to women to elect to undergo an abortion within certain time parameters, has nonetheless recognized that "the State has legitimate interest from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992) (plurality opinion). In reversing a Ninth Circuit Court of Appeals decision striking down the federal Partial-Birth Abortion Ban Act of 2003, the United States Supreme Court later reaffirmed this principle. The Court held that:

> Whatever one's views concerning the *Casey* joint opinion, it is evident a premise central to its conclusion — that the government has a legitimate and substantial interest in preserving and promoting fetal life — would be repudiated were the Court now to affirm the judgments of the Courts of Appeals.

*Gonzales v. Carhart*, 550 U.S. 124, 145 (2007).

It is well within the right of the Kentucky General Assembly to enact, and the Governor to sign, laws designed to promote fully informed decisions by mothers regarding the development of their unborn children, and their decisions to undergo an abortion. Quoting Casey at length:

2

> To the extent [prior U.S. Supreme Court decisions] find a constitutional violation when the government requires, as it does here, the giving of truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the "probable gestational age" of the fetus, those cases go too far, are inconsistent with *Roe's* acknowledgment of an important interest in potential life, and are overruled. … Those [prior] decisions…recognize a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth. (Citation omitted.) It cannot be questioned that psychological well-being is a facet of health. Nor can it be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.

*Casey* at 882.

Affirming and emphasizing these principles of legitimate government interests, the U.S. Supreme Court in *Carhart* stated:

> The government may use its voice and its regulatory authority to show its profound respect for the life within the woman. A central premise of the [*Casey*] opinion was that the Court's precedents after *Roe* had "undervalue[d] the State's interest in potential life." (Citation omitted.)

*Carhart* at 157.

Through H.B. 2, the General Assembly has shown its profound respect for what the U.S. Supreme Court calls "the life within the woman." This legitimate interest is foundational to the constitutionally valid measures the General Assembly has put in place to fully inform the woman of the potential consequence of her choices.

## II. House Bill 2 Does Not Infringe Upon the First Amendment Rights of the Plaintiffs.

The Plaintiffs' Memorandum in support of their Motion notes that Ky. Rev. Stat. § 311.725 establishes requirements for providing informed consent to a woman contemplating an abortion, and the Memorandum states that the "staff take great care to fulfill

3

their legal and ethical responsibility to obtain informed consent from every EMW patient." Plaintiffs' Memorandum at p.2-4. The Memorandum notes that, pursuant to KRS § 311.725, at least 24 hours prior to the abortion, a physician or other designated health care professional must verbally inform the pregnant woman of the following:

- The nature and purpose of the abortion procedure to be performed;
- The medical risks of the abortion procedure;
- Alternatives to the procedure;
- The probable gestational age of the embryo or fetus at the time the abortion is to be performed;
- The medical risks associated with carrying the pregnancy to term;
- That she has the right to view printed materials produced by the Kentucky Cabinet for Health and Family Services … free of charge;
- That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care; and,
- That the father of the fetus is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion.

*Id.* at p.3-4.

It is particularly noteworthy that, in 2000, the requirements of KRS § 311.725 were challenged in federal court by physician abortion providers on constitutional grounds. *Eubanks v. Schmidt*, 126 F.Supp.2d 451 (W.D.Ky.2000). One of the physicians' assertions was, like the instant case, that the statute violated their First Amendment rights not to pay for and distribute ideological speech with which they disagree. The federal district court rejected this claim, noting:

> In *Casey,* the Supreme Court disposed of a somewhat similar First Amendment challenge in a single conclusory paragraph. It recognized the potential First Amendment ramifications of requiring physicians to distribute pamphlets, but held those requirements not to be a violation:
>
>> To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v. Roe,* 429 U.S.

4

> 589, 603, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Eubanks* at 458; in part quoting *Casey* at 884.

The district court further noted that "[t]he Kentucky pamphlets seem much less offensive than those approved in *Casey*… The Court concludes that distributing these pamphlets is a reasonable measure to insure adequate informed consent in all cases of abortion." *Eubanks* at 460.

In the instant case, the Plaintiffs mount a similar First Amendment challenge to H.B. 2, claiming that the requirements of the law improperly compel speech by the physicians, contrary to their First Amendment rights. Plaintiffs' Memorandum at p.12-22. Plaintiffs claim, as a basis for the motion for a temporary restraining order, that they are substantially likely to succeed on the merits of their First Amendment compelled speech claim, and satisfy the factors necessary for issuance of a temporary restraining order. *Id.* at 12.

Plaintiffs' First Amendment claim is based in large part upon the Fourth Circuit Court of Appeals' decision in *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir.2014), which struck down the "Display of Real-Time View Requirement" (the "Requirement") of the Woman's Right to Know Act, a law passed by the North Carolina General Assembly in 2011. The North Carolina law, which is very similar to H.B. 2, was found unconstitutional by the Fourth Circuit Court of Appeals. The Court found that the Requirement "interferes with the physician's right to free speech beyond the extent permitted for reasonable regulation of the medical profession, while simultaneously threatening harm to the patient's psychological health, interfering with the physician's professional judgment, and compromising the doctor-patient relationship." *Stuart* at 250. The *Stuart* decision held that "requiring the physician to speak to a patient who is not listening, rendering the physician the mouthpiece of the state's message, and omitting a therapeutic privilege [*i.e.*, the right to decline or wait to deliver information that the physician believes will result in serious psychological or physical harm] to protect the health of the patient — markedly depart from standard medical practice." *Id.* at 254. The Fourth Circuit also found the fact that

5

the patient will be at least partially disrobed and subject to an ultrasound exceeded the permissible boundaries of informed consent. *Id*. at 254-256.

In direct contrast to the holding in *Stuart*, the Fifth Circuit Court of Appeals in *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir.2012) upheld 2011 amendments to the 2003 Texas Woman's Right to Know Act that increased the informed consent requirements in a manner similar to H.B. 2. As described in *Lakey*, the 2011 amendments made the following changes to the law:

> [R]equire the physician "who is to perform an abortion" to perform and display a sonogram of the fetus, make audible the heart auscultation of the fetus for the woman to hear, and explain to her the results of each procedure and to wait 24 hours, in most cases, between these disclosures and performing the abortion. A woman may decline to view the images or hear the heartbeat…but she may decline to receive an explanation of the sonogram images only on certification that her pregnancy falls into one of three statutory exceptions.
>
> Any woman seeking an abortion must also complete a form indicating that she has received the required materials, understands her right to view the requisite images and hear the heart auscultation, and chooses to receive an abortion. The physician who is to perform the abortion must maintain a copy of this form, generally for seven years.
>
> If a woman ultimately chooses not to receive an abortion, the physician must provide her with a publication discussing how to establish paternity and secure child support.
>
> *Lakey* at 573. (Internal citations to state statutes omitted.)

As in the instant case, appellees in *Lakey* contended that the statutory amendments abridged their First Amendment rights by "compelling the physician to take and display to the woman sonogram images of her fetus, make audible its heartbeat, and explain to her the results of both exams." *Id.* at 574. The appellees' argument, as restated by the Court, was that the information is "the state's 'ideological message' concerning the fetal life that serves no medical purpose, and indeed no other purpose than to discourage the abortion. Requiring the woman to certify the physician's compliance with these procedures also allegedly violates her right 'not to speak.'" *Id.* at 574. Relying primarily upon

6

the Supreme Court's holdings in *Casey* and *Carhart,* the *Lakey* court ruled unanimously that the appellees' First Amendment rights were not violated. *Id.* at 584.

Despite the *Stuart* court claims that the physicians were forced to become the "mouthpiece of the state," the *Lakey* court more faithfully adheres to the rulings in *Casey* and *Carhart*. Requiring physicians to state information that is uncomfortable for them to convey, or for their patients to hear, is not impermissible when the information is truthful, not misleading, and relevant to the decision to undergo an abortion. *Casey* at 882. In *Casey*, the Supreme Court fully contemplated the emotional impact on a woman of contemplating having an abortion, and, as opposed to withholding the information, as the Plaintiffs seek, the Court considered it important that patients be fully apprised about the facts of fetal development. As quoted *supra*, the Supreme Court held that it cannot be doubted that "most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Id.* at 882.[1]

---

1 Similarly, it was the *absence of information* in the context of undergoing a partial-birth abortion, not the communication of information, that the *Carhart* Court feared would cause emotional trauma for the pregnant mother:

> In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here in issue. See, *e.g.*,*National Abortion Federation,* 330 F.Supp.2d, at 466, n. 22 ("Most of [the plaintiffs'] experts acknowledged that they do not describe to their patients what [the D & E and intact D & E] procedures entail in clear and precise terms"); see also *id.,* at 479.
>
> It is, however, precisely this lack of information concerning the way in which the fetus will be killed that is of legitimate concern to the State. *Casey, supra,* at 873, 112 S.Ct. 2791 (plurality opinion) ("States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning"). The State has an interest in ensuring so grave a choice is well informed. It is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know: that she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.

*Carhart* at 159-160.

The *Lakey* decision, in reviewing the physicians' purported First Amendment rights not to provide information regarding the abortion, like the Kentucky district court in *Eubanks*, quoted *supra*, highlighted the *Casey* decision's summary treatment of the physicians' asserted rights:

> To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428 [51 L.Ed.2d 752] (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v. Roe*, 429 U.S. 589, 603, 97 S.Ct. 869, 878 [51 L.Ed.2d 64] (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the state here.

*Lakey* at 575, quoting *Casey* at 884.

The *Lakey* decision concluded that the *Casey* plurality response to the compelled speech claim is "clearly not a strict scrutiny analysis. It inquires into neither compelling interest nor narrow tailoring. The three sentences with which the Court disposed of the First Amendment claims are, if anything, the antithesis of strict scrutiny. … The only reasonable reading of *Casey's* passage is that physicians' rights not to speak are, when 'part of the practice of medicine subject to reasonable licensing and regulation by the State.'" *Id.* at 575.

The Court is also urged to consider the ruling in *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724 (8th Cir.2008) (*en banc*). In *Rounds*, a federal district court granted a preliminary injunction against enforcement of a provision in a South Dakota informed consent law that required a physician performing an abortion to inform the pregnant woman that "the abortion will terminate the life of a whole, separate, unique, living human being." *Id.* at 729. "Human being" was defined in the statute as "an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation." *Id.* at 727. Granting the injunction, the district court found that Planned Parenthood had a "fair chance of success" on its claim that this provision of law violated physicians' free speech rights and that the balance of harms favored Planned Parenthood. *Id.* After a divided panel at the

Eighth Circuit Court of Appeals affirmed the preliminary injunction, an *en banc* hearing was granted. *Id.* at 730.

After reinstating a more rigorous threshold for success in securing a preliminary injunction, the Court then turned to the question of whether the disclosure provision that the unborn child is a "living human being" violated the physicians' First Amendment rights to be free from being compelled to speak. Reviewing the holdings in *Casey* and *Carhart*, the Court in *Rounds* stated that

> while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion. Therefore, Planned Parenthood cannot succeed on the merits of its claim that [the South Dakota statute] violates a physician's right not to speak unless it can show that the disclosure is either untruthful, misleading or not relevant to the patient's decision to have an abortion.

*Id.* at 735.

The *Rounds* decision also rejected the claim that the physician should have had the right to disassociate himself or herself from the required disclosure to protect First Amendment rights against compelled speech. *Rounds* noted that since the information is truthful and non-misleading, there is no ideological message from which the physicians need to disassociate themselves. *Id.* at 737. Vacating the injunction, the Eighth Circuit Court of Appeals found that

> the district court abused its discretion by failing to give effect to the statutory definition of "human being" in [the South Dakota statute]. Planned Parenthood's evidence at the preliminary injunction stage does not establish a likelihood of proving that, with the definition incorporated, the disclosure required by [the statute] is anything but truthful, non-misleading and relevant to the patient's decision to have an abortion, and thus "part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884, 112 S.Ct. 2791. Accordingly, we vacate the preliminary injunction entered on compelled speech grounds by the district court.

*Id.* at 737-738.

9

This Court is urged to adopt the analysis of the *Lakey* and *Rounds* Courts as being more faithful to the Supreme Court decisions in *Casey* and *Carhart*.

## III. Plaintiffs Cannot Satisfy the High Threshold for a Temporary Restraining Order.

When considering whether to issue a restraining order or preliminary injunctive relief,[2] a court must balance the following four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.

*Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012).

A preliminary injunction (or temporary restraining order) is an "extraordinary remedy never awarded as of right." *Winger v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Sixth Circuit Court of Appeals has also held that a preliminary injunction is "an extraordinary measure that has been characterized as one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir.2001) (Internal quotes omitted.)

### a.  Plaintiffs Do Not Have a Strong Likelihood of Success on the Merits of the Action.

As has been clearly set forth above, there is a significant split between the Fourth and Fifth federal circuits on the issue of the constitutionality of laws similar to H.B. 2. As likewise discussed *supra*, the Eighth Circuit decision in Rounds also rejected a physician's First Amendment claim similar to the Plaintiffs'. With two federal circuit decisions (one *en banc*) contrary to the Plaintiffs' position, the Plaintiffs fail to show that they have a "strong likelihood of success on the merits."

---

2 "In determining whether to stay the TRO, we consider the same factors considered in determining whether to issue a TRO or preliminary injunction." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir.2008). (Internal quotations omitted.)

**b. The Movants Will Not Suffer Irreparable Injury Absent the Injunction.**

As the movants will not endure a violation of their First Amendment rights, they cannot show irreparable injury justifying an injunction. Moreover, it should be noted that Plaintiffs have conceded that, when abortions are performed, "on the day of the procedure, the patient receives an ultrasound where the doctor or nurse will confirm that she is pregnant…the probable gestational age, the number of fetuses, and that there are no other abnormalities. This information is conveyed to the woman, she may ask questions, and, if she chooses, see the ultrasound image and a visual representation of the fetal heartbeat, and hear a description of what she is seeing." Plaintiff's Memoradum at 5-6.

Much of what the Plaintiffs describe in the paragraph above occurs pursuant to KRS § 311.725. The burden on the physician to provide the additional information required under H.B. 2 is minor, considering the existing statutory informed consent duties, and the movants will certainly not suffer any injury that is "irreparable."

**c. The Public Interest Will Not Be Served by Issuance of the Injunction. The Public Interest Will, Instead, Be Served by Implementation and Enforcement of the New Law.**

H.B. 2 passed by overwhelming margins in both the Kentucky House of Representatives (83-12) and the Kentucky Senate (32-5).[3] As noted in Section 1 of this Argument, the government has a legitimate interest in protecting unborn life, and the United States Supreme Court has clearly articulated the right of state governments to take measures to protect such life. The "public interest," as expressed through the elected representatives of the people of the Commonwealth, weighs heavily in favor of enforcement and implementation of the new law. Finally, the Plaintiffs have, again, not shown that their constitutional rights are being violated.

## CONCLUSION

As noted above, Plaintiffs, by moving for a temporary restraining order in this case, seek an "extraordinary remedy" that is a "drastic tool" of the judiciary. Their motion falls

---

[3] http://www.lrc.ky.gov/record/17RS/HB2/vote_history.pdf

11

far short of reaching this high threshold for success, most fundamentally because they cannot show a strong likelihood of success on the merits. The United States Supreme Court has clearly concluded in both the *Casey* and *Carhart* decisions that the discomfort that abortion providers inevitably feel about communicating information about fetal development and the pending abortion prior to the procedure does not relieve them of their legal, and indeed, ethical duty to provide that information. "The State has an interest in ensuring so grave a choice is well informed." *Carhart* at 159.

Consequently, the members of the General Assembly submitting this *Amicus* brief strongly urge the Court to reject the Plaintiffs' Motion for a Temporary Restraining Order.

Dated: January 17, 2017

Respectfully Submitted,

/s/ David E. Fleenor
Hon. David E. Fleenor
General Counsel
Office of the Senate President
Capitol Annex, Room 236
Frankfort, KY 40601
Telephone: (502) 564-3120
Facsimile: (502) 564-0456
Email: David.Fleenor@lrc.ky.gov

Hon. Laura Hendrix
General Counsel
Office of the House Speaker
Capitol Annex, Room 332D
Frankfort, KY 40601
Telephone: (502) 564-8100 ext. 261
Email: Laura.Hendrix@lrc.ky.gov

Counsel for Movants

# CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing Motion were served via the electronic filing system on January 17, 2017, to all persons receiving electronic notifications in this case.

/s/ David E. Fleenor
David E. Fleenor, Esq.

13