UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

EMW WOMEN'S SURGICAL CENTER,
P.S.C., et al.,                                                                    Plaintiffs,

v.                                                                    Civil Action No. 3:17-cv-16-DJH

ANDREW G. BESHEAR, et al.,                                            Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

In January 2017, the Kentucky General Assembly hastily passed the Ultrasound Informed Consent Act, referred to as House Bill 2 (H.B. 2).[1] (Docket No. 1-1) Although Kentucky already had a comprehensive informed-consent law pertaining to abortions, Ky. Rev. Stat. § 311.725, H.B. 2 amended the existing law to require physicians to perform an ultrasound prior to an abortion procedure; display and describe the ultrasound images; and auscultate, or make audible, the fetal heartbeat. Physicians must comply with these requirements even if a woman does not want to receive the information and chooses to avert her eyes and cover her ears.

Plaintiffs are the only licensed abortion clinic in Kentucky and its three doctors, who provide abortions and other health services. Defendants are various state government officials. Plaintiffs challenge the constitutionality of H.B. 2, primarily arguing that the law violates their rights under the First Amendment by compelling ideological speech. The Commonwealth argues that the law is within the Commonwealth's authority to regulate the practice of medicine.

Three similar "speech-and-display" ultrasound laws have been challenged in states outside the Sixth Circuit. The Fifth Circuit upheld Texas's speech-and-display ultrasound law in *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th Cir. 2012).

---

[1] H.B. 2 has since been codified at Ky. Rev. Stat. §§ 311.727, .990(32).

Within a year of *Lakey*, the Supreme Court of Oklahoma concluded that Oklahoma's speech-and-display ultrasound law was facially unconstitutional. *See Nova Health Sys. v. Pruitt*, 292 P.3d 28 (Okla. 2012) (per curiam). In *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014), the Fourth Circuit explicitly disagreed with *Lakey*, holding that North Carolina's speech-and-display ultrasound law violated the First Amendment. The main reason for these differing outcomes rests on how the various courts interpreted a single paragraph in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

Finding the Fourth Circuit's reasoning persuasive, the Court concludes that H.B. 2 violates the First Amendment. Like the Fourth Circuit, the Court recognizes that states have substantial interests in protecting fetal life and ensuring the psychological well-being and informed decision-making of pregnant women. *See Stuart*, 774 F.3d at 250. However, H.B. 2 does not advance those interests and impermissibly interferes with physicians' First Amendment rights. The Court will therefore enjoin enforcement of H.B. 2.

## I. BACKGROUND

Prior to H.B. 2, the informed-consent process for abortion in Kentucky was governed by Ky. Rev. Stat. § 311.725. This statute required that, at least twenty-four hours before an abortion was performed, a woman receiving an abortion must be informed of the following:

- the nature and purpose of the abortion procedure to be performed as well as the medical risks and alternatives to the procedure that a reasonable patient would consider material to the decision of whether or not to undergo the abortion;
- the probable gestational age of the fetus;
- the medical risks associated with carrying the pregnancy to term;
- the availability of printed materials published by the Cabinet for Health and Family Services that she has a right to view free of charge if she so chooses;
- the potential availability of medical assistance benefits for prenatal care, childbirth, and neonatal care; and
- the liability of the father of the fetus to assist in the support of her child.

Ky. Rev. Stat. § 311.725(1)(a)–(b).

The Cabinet materials referred to in § 311.725 contain two general types of information. The first concerns alternatives to abortion, such as adoption. Ky. Rev. Stat. § 311.725(2)(a). A list of various agencies and the services those agencies offer is provided. *Id.* These materials also contain information on medical assistance benefits for prenatal care, childbirth, and neonatal care, as well as information on the father's child-support obligations. *Id.* The second type of information is "objective and nonjudgmental" scientific and medical information about fetal development. § 311.725(2)(b). The materials inform the reader of the "probable anatomical and physiological characteristics" of the embryo or fetus at two-week gestational increments for the first sixteen weeks and at four-week gestational increments thereafter. *Id.* For each stage, the materials must contain a pictorial representation and some other image for scale to reflect the actual size of the fetus. *Id.*

Abortion providers challenged these regulations in *Eubanks v. Schmidt*, 126 F. Supp. 2d 451 (W.D. Ky. 2000). The plaintiffs in *Eubanks* sought to enjoin enforcement of § 311.725 on behalf of themselves and their patients. *Id.* at 453. The plaintiffs first argued that the requirements placed an undue burden on a woman's right to an abortion, particularly for those "who must travel long distances, who have few financial resources, and who have difficulty explaining their absence to employers, spouses, or others." *Id.* at 454. This Court concluded that the statute did not place an undue burden on women seeking an abortion in Kentucky. *See id.* at 453–57.

The plaintiffs in *Eubanks* also challenged the law on First Amendment grounds, arguing that it "compel[led] them to pay for and distribute ideological speech with which they disagree[d]." *Id.* at 457. Recognizing the brevity of the Supreme Court's disposition of the First

Amendment claims in *Casey*,[2] Judge Heyburn reasoned that "[i]f Kentucky's pamphlets and the resulting infringement on speech are legally indistinguishable from those presented in *Casey*, then *Casey* controls." *Id.* at 459. Judge Heyburn found that the information provided in Kentucky's pamphlets was "quite similar" to the information provided in *Casey*. *Id.* He concluded that "distributing these pamphlets is a reasonable measure to insure adequate informed consent in all cases of abortion." *Id.* at 460 (citing *Casey*, 505 U.S. at 882–83). Because the content of the Kentucky pamphlet was similar to that in *Casey*, it fell within "the constitutional limits for which *Casey* stands." *Id.*

Unlike Kentucky's existing informed-consent laws, H.B. 2 was not accompanied by any legislative findings. *See* Ky. Rev. Stat. Ann. § 311.710 (containing the General Assembly's legislative findings in support of § 311.725). H.B. 2 imposes additional requirements upon abortion providers and women seeking abortions. Prior to a woman giving informed consent to an abortion, H.B. 2 requires a physician to

- perform an obstetric ultrasound on the woman;
- give a simultaneous explanation of what the ultrasound depicts;
- display the ultrasound images so that the woman may view them;
- auscultate the fetal heartbeat so that the woman may hear it;
- provide a medical description of the ultrasound images; and
- retain signed certification from the woman that the above information was given.

H.R. 2, 2017 Gen. Assemb., Reg. Sess. (Ky. 2017). The only exception to these requirements is for medical emergencies. *Id.* H.B. 2 further states that "nothing in this section shall be

---

[2] Of the petitioners' First Amendment arguments in *Casey*, the plurality said:

> [T]he physician's First Amendment rights not to speak are implicated, *see Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the state, *cf. Whalen v. Roe*, 429 U.S. 589, 603, 97 S. Ct. 869, 878, 51 L. Ed. 2d 64 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Casey*, 505 U.S. at 884.

construed to prevent the pregnant woman from averting her eyes from the ultrasound images or requesting the volume of the heartbeat be reduced or turned off." *Id.* No penalty is imposed on a woman who refuses to look at the ultrasound images or listen to the heartbeat. *Id.* However, physicians who violate the requirements are subject to penalties including fines of up to $100,000 for the first offense and $250,000 for each subsequent offense. *Id.* Further, courts are to report any violation to the Kentucky Board of Medical Licensure for whatever action or discipline the Board deems appropriate. *Id.*

Because H.B. 2 contained an emergency clause, it became effective immediately once signed by the governor. Plaintiffs filed this action (D.N. 1) and moved for a temporary restraining order to temporarily block enforcement of H.B. 2.[3] (D.N. 3) The Court held an evidentiary hearing on March 23, 2017, on Plaintiffs' motion for temporary restraining order.[4] The parties agreed to advance the trial on the merits and consolidate it with the March 23, 2017 hearing pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. (D.N. 53) The parties then filed cross-motions for summary judgment, which are now before the Court. (D.N. 58; D.N. 59; D.N. 60; D.N. 62)

---

[3] Although Plaintiffs' complaint asserted six claims for relief (*see* D.N. 1, PageID # 13-15), the parties' arguments have focused exclusively on the first of those claims, which alleges that H.B. 2 violates the First Amendment rights of physicians. (*Id.*, PageID # 13; *see, e.g.*, D.N. 55, PageID # 838 (agreeing that "[t]his is a First Amendment case and the claim is about a physician's fundamental First Amendment right not to be compelled to speak by the State")) Accordingly, the Court's discussion herein will be limited to that claim.

[4] Prior to the hearing, General Assembly members Robert Stivers, Jeff Hoover, Whitney Westerfield, and Joseph M. Fischer filed a motion requesting leave to file a brief as amici curiae. (D.N. 18) "[P]articipation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within the sound discretion of the courts, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) (internal citations and quotations omitted). The historical purpose of an amicus "was to provide *impartial* information on matters of law about which there was doubt, especially in matters of public interest." *Id.* at 164. Because Plaintiffs here do not object (*see* D.N. 31, PageID # 324), the motion for leave to file an amicus brief will be granted.

## II. STANDARD

In order to grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying the basis for its motion and the parts of the record that demonstrate an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the non-moving party must point to specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see* Fed. R. Civ. P. 56(c)(1). "[O]n cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). The Court concludes that there is no genuine dispute of material fact in this case.

## III. DISCUSSION

Plaintiffs argue that H.B. 2 violates their First Amendment rights because it compels them to deliver the state's ideological, anti-abortion message to their patients. (D.N. 60-1, PageID # 903) But for H.B. 2, Plaintiffs would not force ultrasound images, detailed descriptions of the fetuses, or the sounds of the fetal heartbeat on abortion patients who do not wish to hear the descriptions or heartbeat or see the images. (*Id.*, PageID # 904) Plaintiffs assert that because H.B. 2 compels ideological, content-based speech, it necessarily triggers at least intermediate scrutiny, which it cannot survive. (*Id.*, PageID # 903, 910) Intermediate scrutiny requires the state to prove that "the statute directly advances a substantial governmental interest

and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 572 (2011) (citing *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480-81 (1989); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)).

The Commonwealth maintains that H.B. 2 is constitutional because states have the right to regulate the practice of medicine. (D.N. 62-1, PageID # 1820) It argues that H.B. 2 is subject to rational basis review, which requires only that the statute "bear some rational relation to a legitimate state interest." *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002) (citing *Romer v. Evans*, 517 U.S. 620, 632 (1996)). But the Commonwealth adds that H.B. 2 could survive even intermediate scrutiny, as the law merely requires physicians to disclose truthful, non-misleading, and relevant information. (D.N. 62-1, PageID # 1825, 1835)

The Court's analysis will begin with a discussion of relevant authority, including those cases forming the circuit split over the constitutionality of speech-and-display ultrasound laws. Next, the Court will explain that the Fourth Circuit's intermediate-scrutiny approach is appropriate because H.B. 2 compels ideological speech. The Court will then apply intermediate scrutiny to the facts of this case, ultimately finding that H.B. 2 is unconstitutional.

### A.

The First Amendment protects an individual's right to refrain from speaking just as much as it protects the right to speak freely. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943) (Murphy, J., concurring)); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) ("[A]ll speech inherently involves choices of what to say and what to leave unsaid." (emphasis removed) (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion))); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) ("[T]he

First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.").  At issue here is compelled speech, which "is particularly suspect because it can directly affect listeners as well as speakers.  Listeners may have difficulty discerning that the message is the state's, not the speaker's, especially where the 'speaker [is] intimately connected with the communication advanced.'"  *Stuart*, 774 F.3d at 246 (alteration in original) (quoting *Hurley*, 515 U.S. at 576).  Statutes that compel speech are considered content-based regulations of speech, as "[m]andating speech that a speaker would not otherwise make necessarily alters the content of speech."  *Riley*, 487 U.S. at 795.  This is true whether the compelled speech involves statements of opinion or statements of fact.  *Id.* at 797–98.

Content-based regulations are generally subject to strict scrutiny.  *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015).  Such regulations can only survive if the government proves that the regulation "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Id.* (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).  Because H.B. 2 mandates speech Plaintiffs would not otherwise make, its requirements are "quintessential compelled speech."  *Stuart*, 774 F.3d at 246.  But courts reviewing speech-and-display ultrasound laws like H.B. 2 have not applied strict scrutiny.  Nor have these courts reached a consensus on which level of scrutiny applies.  The Sixth Circuit has not yet addressed the issue.  Looking to other circuits for persuasive authority, the Court finds that the circuit courts of appeals are split.  Thus, the Court must first determine whether First Amendment scrutiny is triggered here and, if so, which level of scrutiny applies.

The Fifth Circuit reviewed the constitutionality of Texas's speech-and-display ultrasound law in *Lakey*, holding that the law was within the state's right to regulate the practice of

medicine. *See* 667 F.3d at 580. The court did not believe the law triggered First Amendment scrutiny. *Id.* at 576. In reaching this conclusion, the court relied heavily on the Eighth Circuit's decision in *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc), which upheld a South Dakota statute regulating informed consent to abortion. Though not a speech-and-display ultrasound law, the law at issue in *Rounds* required physicians to provide abortion patients with certain information prior to the procedure. *Id.* at 726-27. Planned Parenthood argued that the law compelled ideological speech because it required specific disclosures such as "[t]hat the abortion would terminate the life of a whole, separate, unique, living human being." *Id.* at 726; *see id.* at 727. Relying on *Casey* and *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Eighth Circuit concluded that "while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion." *Id.* at 734–35.

The Fifth Circuit agreed with the Eighth Circuit that both *Casey* and *Gonzales* acknowledge the state's significant role in regulating the medical profession. *Lakey*, 667 F.3d at 575–76. In particular, the *Lakey* court noted that *Casey* clearly did not apply strict scrutiny to the First Amendment claims in that case. *Id.* at 575 ("The three sentences with which the Court disposed of the First Amendment claims are, if anything, the antithesis of strict scrutiny."). Instead, the Fifth Circuit read *Casey* to hold "that physicians' rights not to speak are, when 'part of the practice of medicine, subject to reasonable licensing and regulation by the State.'" *Id.* (quoting *Casey*, 505 U.S. at 884). The court thus concluded that the speech-and-display

requirements did not trigger First Amendment strict scrutiny as compelled, ideological speech. *Id.* at 576.

Not all courts interpret *Casey* this way. Although its brief opinion provides little analysis of *Casey*, the Supreme Court of Oklahoma found Oklahoma's speech-and-display law to be "facially unconstitutional pursuant to *Casey*." *Pruitt*, 292 P.3d at 28. More significantly, the Fourth Circuit explicitly disagreed with the Fifth and Eighth Circuits, stating that those courts "read too much into *Casey* and *Gonzales*." *Stuart*, 774 F.3d at 249. The Fourth Circuit concluded that "[*Casey*] did not hold sweepingly that all regulation of speech in the medical context merely receives rational basis review." *Id.* Further, the court interpreted the *Gonzales* decision to be limited to the state's role in regulating the informed-consent process because *Gonzales* is silent on which level of scrutiny to apply when reviewing a compelled-speech claim in the abortion context. *Id.*

Recognizing that there are "many dimensions" to professional speech, the Fourth Circuit concluded that it was necessary to analyze the North Carolina speech-and-display law for First Amendment purposes. *Id.* at 247 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)). Of course, the court recognized that states have the power to regulate the medical profession, including imposing licensing requirements, requiring payment of dues to professional organizations, setting standards of conduct, and requiring certain disclosures for informed consent. *Id.* at 247 (citing *Keller v. State Bar of Cal.*, 496 U.S. 1, 16 (1990); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *King v. Governor of N.J.*, 767 F.3d 216, 232 (3d Cir. 2014); *Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972)). However, the court explained, "[w]hen the First Amendment rights of a professional are at stake, the stringency of review . . . slides 'along a continuum' from 'public dialogue' on one end to 'regulation of the professional

*conduct*' on the other." *Id.* at 248 (quoting *Pickup v. Brown*, 740 F.3d 1208, 1227, 1229 (9th Cir. 2013)). Finding speech-and-display requirements to fall in the middle of that sliding scale, the court chose to apply intermediate scrutiny. *Id.* The court concluded: "A heightened intermediate level of scrutiny is . . . consistent with Supreme Court precedent and appropriately recognizes the intersection here of regulation of speech and regulation of the medical profession in the context of an abortion procedure." *Id.* at 249.

Applying intermediate scrutiny, the Fourth Circuit held that North Carolina's speech-and-display law was unconstitutional. *Id.* at 250. The state's interests in protecting fetal life and protecting the pregnant woman's welfare and informed decision-making were obviously important. *Id.* at 250-51. But the requirements of North Carolina's speech-and-display law were "far-reaching—almost unprecedentedly so—in a number of respects and far outstrip[ped] the provision at issue in *Casey*." *Id.* at 250. The law interfered with physicians' First Amendment rights "beyond the extent permitted for reasonable regulation of the medical profession, while simultaneously threatening harm to the patient's psychological health, interfering with the physician's professional judgment, and compromising the doctor-patient relationship." *Id.*

Recently, the Eleventh Circuit sitting en banc expressed approval of the Fourth Circuit's interpretation of *Casey* when it decided that certain provisions of Florida's Firearms Owners' Privacy Act (FOPA) violated the First Amendment rights of doctors. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) (en banc). The four FOPA provisions at issue in *Wollschlaeger* were content-based regulations of speech that restricted speech by physicians and other medical professionals on the subject of firearm ownership. *Id.* at 1300. Physicians routinely ask their patients about potential health and safety risks, and many leading medical associations believe that unsecured firearms increase the risk of injury, especially for minors and

those suffering from depression or dementia. *Id.* at 1301. The Florida Legislature enacted FOPA after learning of six incidents where patients complained that physicians asked them questions regarding firearm ownership. *Id.* at 1302.

The "record-keeping" provision of FOPA states that a physician may not enter any information concerning firearm ownership into a patient's medical record if such information is not relevant to the patient's medical care, the patient's safety, or the safety of others. *Id.* (citing Fla. Stat. § 790.338(1)). The "inquiry" provision states that a physician should refrain from making a written inquiry or asking questions concerning firearm ownership unless he or she believes in good faith that such information is relevant to the patient's medical care, the patient's safety, or the safety of others. *Id.* at 1302-03 (citing Fla. Stat. § 790.338(2)). The "anti-discrimination" provision states that a physician may not discriminate against a patient based solely on firearm ownership or possession. *Id.* at 1303 (citing Fla. Stat. § 790.338(5)). The "anti-harassment" provision states that a physician "should refrain from unnecessarily harassing a patient about firearm ownership during an examination." *Id.* (quoting Fla. Stat. § 790.338(6)). FOPA violations are punishable by fines and discipline by the Florida Board of Medicine. *Id.*

According to the Eleventh Circuit, the record-keeping, inquiry, and anti-harassment provisions of FOPA "constitute speaker-focused and content-based restrictions on speech." *Id.* at 1307. The record-keeping and inquiry provisions "expressly limit the ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message." *Id.* The anti-harassment provision is also a speaker-focused and content-based restriction. *Id.* The Eleventh Circuit believed that it referred to "questions or advice to patients concerning the subject of firearm ownership." *Id.* The court recognized that content-based

restrictions normally trigger strict scrutiny. *Id.* at 1308 (citations omitted). However, because it found that the FOPA provisions failed under intermediate scrutiny, the court did not determine whether strict scrutiny applied. *Id.*

Florida argued that the First Amendment was not implicated because "any effect on speech [was] merely incidental to the regulation of professional conduct." *Id.* But the state's argument relied on Justice White's framework for evaluating professional speech, which was espoused in a concurrence. *Id.* (citing *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring). Justice White concluded that the speech of an individual "'engaging in the practice of a profession' . . . is 'incidental to the conduct of the profession,' such that [the individual's] First Amendment interests are diminished." *Id.* (quoting *Lowe*, 472 U.S. at 232 (White, J., concurring)). In a later dissent, Justice White advocated for rational basis review of professional speech. *Id.* (citing *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 802 (1986) (White, J., dissenting)). However, "[t]he Supreme Court has never adopted or applied Justice White's rational basis standard to regulations which limit the speech of professionals to clients based on content." *Id.* at 1310 (citations omitted). Instead, on at least two other occasions, the Supreme Court has applied heightened scrutiny to regulations that restricted the speech of professionals. *Id.* (citing *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–48 (2001); *N.A.A.C.P. v. Button*, 371 U.S. 415, 438–44 (1963)).

In *Velazquez*, the Supreme Court applied heightened scrutiny to a federal law that prohibited attorneys employed by entities that receive funds from the Legal Services Corporation from challenging existing welfare laws and from advising their clients about such challenges. *See* 531 U.S. at 536–37, 542-48. The Supreme Court concluded that the law violated the First Amendment because it limited constitutionally protected expression and altered the traditional

role of the attorneys. *Id.* at 544–48. *Button* concerned a Virginia law that prohibited organizations like the N.A.A.C.P. from finding or retaining lawyers for individual litigants and paying those lawyers a per diem fee for their services. 371 U.S. at 423. The Supreme Court concluded that this law violated the First Amendment because the state failed to advance any substantial regulatory interest justifying the prohibition. *Id.* at 444. In *Wollschlaeger*, the Eleventh Circuit reasoned that because the Supreme Court

> cited and discussed *Button* with approval recently in *Reed*, 135 S. Ct. at 2229, the state officials cannot successfully rely on a single paragraph in the plurality opinion of three Justices in *Planned Parenthood of Southeastern Pennsylvania v. Casey* . . . to support the use of rational basis review here. In any event, as Judge Wilkinson correctly explained for the Fourth Circuit, the *Casey* "plurality did not hold sweepingly that all regulation of speech in the medical context merely receives rational basis review."

848 F.3d at 1310–11 (quoting *Stuart*, 774 F.3d at 249).

The Eleventh Circuit not only expressly agreed with the Fourth Circuit's view that *Casey* fails to set a broad standard, but it also showed why Justice White's rational basis standard is unpersuasive. *See id.* Plaintiffs urge the Court to follow the Fourth Circuit and the Eleventh Circuit. They contend that the above excerpt from *Wollschlaeger* indicates that the Eleventh Circuit rejected the very same arguments made by the Commonwealth here. (D.N. 37, PageID # 536-37) Indeed, the Commonwealth argues that *Casey* and Justice White's concurrence in *Lowe* require the Court to apply rational basis review.[5] (D.N. 62-1, PageID # 1835) It further

---

[5] The Commonwealth also relies on *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), in support of this argument. This reliance appears misplaced. *Zauderer* concerned certain restrictions on attorney advertisements. *See id.* at 629. The Supreme Court held that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* at 651. In so holding, the Supreme Court permitted regulations that required "purely factual and uncontroversial information" to be disclosed in advertisements. *Id.*
    The Commonwealth argues that *Zauderer* requires application of rational basis review "to disclosures that professionals are required to give to clients." (D.N. 62-1, PageID # 1831)

contends that *Wollschlaeger* fails to support Plaintiffs' case because the statute at issue in *Wollschlaeger* prohibited speech rather than compelling it. (D.N. 38, PageID # 540; D.N. 67, PageID # 1901) However, the Commonwealth addresses neither the Eleventh Circuit's approval of the Fourth Circuit's decision in *Stuart* nor its assessment of Justice White's concurrence.

### B.

At the heart of the circuit split outlined above is the question of whether *Casey* requires rational basis review of all speech restrictions in the physician-patient context. The Court finds the decisions of the Fourth and Eleventh Circuits more persuasive and agrees that *Casey* did not set a broad standard. The Fourth Circuit recognized the differences between the required disclosures in *Casey* and the required disclosures of speech-and-display ultrasound laws like H.B. 2. In the context of abortion, laws like H.B. 2 are designed to convey the state's ideological, anti-abortion message. Such laws go well beyond the basic disclosures necessary for informed consent to a medical procedure. That the disclosures mandated by H.B. 2 may be truthful, non-misleading, and relevant to a woman's decision to have an abortion is not dispositive. *See Stuart*, 774 F.3d at 246. "Although the State may at times prescribe what shall be orthodox in commercial advertising by requiring the dissemination of purely factual and uncontroversial information, outside that context it may not compel affirmance of a belief with

---

But the fact that attorneys and physicians are both regulated professionals does not make *Zauderer* applicable here. *Zauderer* is confined to *commercial speech* in the *advertising* context. *Nat'l Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 522 (D.C. Cir. 2015) ("[T]he Supreme Court's opinion in *Zauderer* is confined to advertising, emphatically, and, one may infer, intentionally."); *see also Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 524 (6th Cir. 2012) (stating that *Zauderer* applies in the context of "misleading or potentially misleading commercial speech"). Contrary to the Commonwealth's assertion, the speech at issue here does not propose a commercial transaction and thus is not commercial speech. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (holding that commercial speech, which does no more than propose a commercial transaction, is protected by the First Amendment). Thus, *Zauderer* is unpersuasive in this context.

15

which the speaker disagrees." *Hurley*, 515 U.S. at 573 (internal citations and quotations omitted). "[T]he speaker has the right to tailor the speech," and this "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-42 (1995); *Riley*, 487 U.S. at 797–98).

It is misguided to assert, as does the Commonwealth, that the requirements of H.B. 2 "are no different in essence" than the requirements upheld by *Eubanks* or *Casey*. (D.N. 62-1, PageID # 1819) The requirements at issue in *Eubanks* were nearly indistinguishable from those of *Casey*, which was Judge Heyburn's primary reason for upholding them. *See Eubanks*, 126 F. Supp. 2d at 459 ("Irrespective of the Supreme Court's limited discussion [of the First Amendment in *Casey*], one must recognize an overriding imperative: If Kentucky's pamphlets and the resulting infringement on speech are legally indistinguishable from those presented in *Casey*, then *Casey* controls."). Although Judge Heyburn considered the disclosures in *Casey* and *Eubanks* to be "compelled speech," he carefully distinguished them from compelled *ideological* speech. *See id.* at 458-59.

This distinction is what warrants greater protection of the First Amendment rights of Plaintiffs here. Speech-and-display laws like H.B. 2 compel ideological speech. *See Stuart*, 774 F.3d at 242, 246. *Casey* contained no discussion of ideological speech. In *Eubanks*, Judge Heyburn noted that if the compelled speech in *Casey* had been ideological, Justice O'Connor would have said so. *Eubanks*, 126 F. Supp. 2d at 458. This is because, prior to the *Casey* plurality, Justice O'Connor dissented in *City of Akron v. Akron Center for Reproductive Health*, noting that informed-consent provisions may "violate the First Amendment rights of the physician if the State requires him or her to communicate its ideology." 462 U.S. 416, 472 n.16

(1983) (O'Connor, J., dissenting) (citing *Wooley*, 430 U.S. 705), *overruled by Casey*, 505 U.S. at 882; *see also Eubanks*, 126 F. Supp. 2d at 458 n.11. The Court thus views this Opinion as consistent with and, at minimum, not in conflict with Judge Heyburn's holding in *Eubanks*.

The declaration of Kentucky State Senator Robert Stivers denies that H.B. 2 is intended to convey an ideological message. (D.N. 32-7, PageID # 420) But the Commonwealth argues that the state has an interest in reducing abortions and a right to enact legislation to that effect. (D.N. 21, PageID # 230; D.N. 55, PageID # 671–72; D.N. 62-1, PageID # 1836) H.B. 2 is intended to advance that interest. And as the Fourth Circuit stated, "[c]ontext matters." *Stuart*, 774 F.3d at 246 (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013) (en banc)). This is especially true when evaluating compelled speech. *See id.* at 247; *see also Riley*, 487 U.S. at 796. ("Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon."). H.B. 2 is intended to dissuade women from choosing abortion by forcing ultrasound images, detailed descriptions of the fetus, and the sounds of the fetal heartbeat on them, against their will, at a time when they are most vulnerable. *Cf. Stuart*, 774 F.3d at 245 ("The clear import of displaying the sonogram in this context—while the woman who has requested an abortion is partially disrobed on an examination table—is to use the visual imagery of the fetus to dissuade the patient from continuing with the planned procedure.").

Of the requirements at issue in *Eubanks*, Judge Heyburn stated that "[t]hough the legislature passed this Statute to further its preference for birth over abortion[,] the pamphlets do not overtly trumpet that preference. They provide information from which a woman might naturally select the choice favored by the legislature." *Eubanks*, 126 F. Supp. 2d at 458 n.11. By

contrast, H.B. 2 is designed to persuade a woman to choose the option favored by the legislature by imposing certain information, imagery, and sounds upon her in a vulnerable state and time. H.B. 2 thus "overtly trumpet[s]" the anti-abortion preference of the legislature and is ideological in nature. *Id.*; *see also Stuart*, 774 F.3d at 242, 246, 255.

"[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. Both *Stuart* and *Wollschlaeger* concluded that, despite the state's power to regulate certain professions, members of those professions are still entitled to speech protection. Simply "[b]eing a member of a regulated profession does not . . . result in a surrender of First Amendment rights." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (citing *Thomas v. Collins*, 323 U.S. 516, 531 (1945)). Even *Eubanks* recognized that "[t]he Supreme Court *has consistently invalidated schemes which compel ideological speech*." *Eubanks*, 126 F. Supp. 2d at 458 (emphasis added) (citing *Keller*, 496 U.S. at 14; *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977)). The conclusion reached here is thus consistent with *Eubanks*.

In sum, the Court finds the Fourth Circuit's application of intermediate scrutiny and its rationale in *Stuart* to be persuasive, particularly because of the key differences between H.B. 2 and the informed-consent laws at issue in *Casey* and *Eubanks*. The Eleventh Circuit's recent approval of the Fourth Circuit's decision underscores the soundness of *Stuart*'s rationale. Therefore, the Court concludes that application of at least intermediate scrutiny is necessary here, as rational basis review would fail to acknowledge the severity of the burden H.B. 2 imposes upon the First Amendment rights of physicians.

## C.

Having adopted the Fourth Circuit's approach, the Court will apply intermediate scrutiny. As the North Carolina law reviewed by the Fourth Circuit is nearly identical to Kentucky's law, the result is the same—H.B. 2 is unconstitutional. But before the Court conducts its constitutional analysis of H.B. 2, a statement of the relevant facts is necessary.

## 1.

At the March 23, 2017 evidentiary hearing, the Court heard testimony from Dr. Tanya Franklin (one of the plaintiffs) as well as Plaintiffs' expert witnesses, Dr. Steven Joffe and Dr. Mark Nichols. Dr. Franklin is a board-certified obstetrician/gynecologist and provides a variety of healthcare services in addition to abortion. (D.N. 55, PageID # 682-83) Dr. Joffe is an associate professor of medical ethics and health policy and an associate professor of pediatrics at the University of Pennsylvania Perelman School of Medicine. (*Id.*, PageID # 734) He practices medicine in the field of pediatric hematology/oncology, but the bulk of his work, including research, teaching, and consulting, concerns medical ethics. (*Id.*) Dr. Nichols is a board-certified obstetrician/gynecologist and a professor at the Oregon Health and Science University. (*Id.*, PageID # 800) Dr. Nichols practices medicine at OHSU and Planned Parenthood. (*Id.*, PageID # 800, 802) For twenty years, he served as the medical director of Planned Parenthood in Portland, Oregon, where he wrote protocols on patient care. (*Id.*, PageID # 802)

The Commonwealth called no witnesses at the hearing, but it submitted declarations from two board-certified obstetrician/gynecologists, Dr. John Seeds and Dr. W. David Hager, in opposition to Plaintiffs' motion for temporary restraining order. (D.N. 32-1; D.N. 32-2) These declarations do little to refute the testimony proffered at the hearing.

Dr. Hager practices in Lexington, Kentucky. (D.N. 32-2, PageID # 399) He has counseled patients who were considering abortion, but he does not state that he has any experience performing elective abortions. (*Id.*, PageID # 402) He explains that in his practice, he shows patients "photographs, pamphlets and videos of the proposed gynecologic procedures and the organs that will be involved." (*Id.*, PageID # 401) For pregnancy, he states that "an ultrasound is a necessary means of visualizing the infant in order to make an accurate diagnosis and to plan appropriate management in pregnancy." (*Id.*) He describes these steps as the "proper standard of care." (*Id.*) Notably, the requirements of H.B. 2—auscultating the fetal heartbeat and displaying and describing the ultrasound images against an abortion patient's wishes—are not included in his description of the "proper standard of care." Nevertheless, Dr. Hager opines that the requirements of H.B. 2 are necessary to fully inform patients. (*Id.*, PageID # 405)

This opinion, however, appears to stem from a fundamental misunderstanding of Plaintiffs' practice. Dr. Hager states, "I understand the Plaintiff physicians to say that, absent HB 2, they would not show an ultrasound to women patients, not tell them what is depicted on the ultrasound, and not make available the unborn child's heartbeat for the expectant mother to hear, should she desire to do so." (*Id.*, PageID # 404-05) This is an inaccurate summary of Plaintiffs' practice. Plaintiffs *offer* such information to a patient and will provide the information if the patient wants it. (D.N. 55, PageID # 694, 703–04) But absent H.B. 2, Plaintiffs would not force that information on a patient.

Similar to Dr. Hager, Dr. Seeds opines that H.B. 2 conforms to existing national standards of care. (D.N. 32-1, PageID # 366) But many of his assertions are undermined by the testimony given at the hearing. Critically, Dr. Seeds's opinion never addresses the standard of

care for abortion set by the National Abortion Federation (NAF), which is the standard of care followed by the EMW clinic. (D.N. 55, PageID # 704–05, 813) Nor does Dr. Seeds clearly indicate whether he has ever performed elective abortions. (*See* D.N. 32-1, PageID # 352) Further, his opinion is premised on the assumption that viewing the ultrasound image and listening to the ultrasound description and fetal heartbeat are voluntary for the patient. (*Id.*, PageID # 349) Dr. Franklin's testimony revealed that it is impossible for a patient to entirely ignore the information being forced upon her. (*See* D.N. 55, PageID # 699–700, 722) Additionally, Dr. Seeds states that the mandated disclosures strengthen, rather than impair, the physician-patient relationship. (D.N. 32-1, PageID # 363) However, as mentioned, Dr. Seeds does not perform elective abortions (*id.*, PageID # 352, 363), and Dr. Franklin's hearing testimony—which is based on firsthand observation of the effects of H.B. 2—directly refutes this assertion. (D.N. 55, PageID # 706–07)

Ultimately, any discrepancy between the hearing testimony and the doctors' declarations is immaterial. The following unrebutted facts were established at the hearing.

Patient autonomy—the patient's ability to make informed decisions about her own medical care—is at the heart of the informed-consent process. (*Id.*, PageID # 743–44, 808, 829) The informed-consent process consists of five core elements or types of information that the physician will disclose to the patient: the nature of the procedure, the purpose of the procedure, the potential risks of the procedure, the potential benefits of the procedure, and the major alternatives to the procedure. (*Id.*, PageID # 688–89, 744–45, 807–09; *see also* D.N. 32-1, PageID # 344–46) The information mandated by H.B. 2 falls outside of these core elements. (*See* D.N. 55, PageID # 744–45) Offering the mandated information is acceptable and consistent with principles of patient autonomy, as it respects the patient's ability to decide whether or not

21

she wants more information beyond the five core elements listed above. (*Id.*, PageID # 744–45) The American Medical Association has stressed the importance of patient autonomy in the informed-consent process, stating that physicians must "[p]resent relevant information accurately and sensitively, in keeping with the patient's preference for receiving medical information." (*Id.*, PageID # 748)

EMW clinic is accredited by NAF and follows its standard of care. (*Id.*, PageID # 683) H.B. 2 is inconsistent with that standard. (*See id.*, PageID # 704–05, 813) Guidelines written by the American Congress of Obstetricians and Gynecologists (ACOG) also inform the practice of medicine in this field and the informed-consent process. (*See id.*, PageID # 755-56, 758-59; *see also* D.N. 32-1, PageID # 352–53) But Dr. Franklin and Dr. Nichols were unaware of any ACOG guidance that recommends or requires a physician to simultaneously display and describe an ultrasound or auscultate the fetal heartbeat prior to performing an abortion. (*See* D.N. 55, PageID # 708, 813, 817, 819–20) The witnesses were similarly unaware of any medical procedure for which it is required that a patient view diagnostic images in order to give informed consent. (*Id.*, PageID # 707, 746, 810)

The NAF standard of care requires physicians to perform an ultrasound to date the pregnancy, look for any abnormalities, and determine if a fetal demise has occurred. (*Id.*, PageID # 693-94, 705) ACOG guidelines also require that an obstetric ultrasound be performed, for the same reasons. (*See* D.N. 32-1, PageID # 355) But it is not the standard of care to force the patient to view the ultrasound or listen to a detailed description of the internal and external organs of the fetus, as well as the fetal heartbeat. (*See* D.N. 55, PageID # 705, 708, 813, 817, 819–20) Despite this, physicians at EMW clinic have been complying with H.B. 2. (*Id.*, PageID

# 726)  Notably, the testimony at the hearing established that the requirements of H.B. 2 had not dissuaded any women from undergoing an abortion.  (*See id.*, PageID # 726-27, 728-29)

The testimony further revealed that H.B. 2 causes patients distress.  Most patients choose to look away from the ultrasound image.  (*Id.*, PageID # 699)  But although they may attempt to avoid listening to the fetal heartbeat and ultrasound description, it is impossible for patients to entirely drown out the sounds.  (*Id.*, PageID # 699–700, 722)  During the process mandated by H.B. 2, patients are "very upset," "crying," and even "sobbing."  (*Id.*, PageID # 699)  For victims of sexual assault, the requirements of H.B. 2 "can be extremely upsetting."  (*Id.*, PageID # 698)  Similarly, for patients diagnosed with a fetal anomaly, who have already had several ultrasounds performed and heard detailed descriptions of the fetus, the requirements of H.B. 2 "can be extremely difficult" and "emotional."  (*Id.*, PageID # 700-01; D.N. 41, PageID # 601–03)

## 2.

Having established the relevant facts, the Court will now apply intermediate scrutiny. Intermediate scrutiny requires the state to prove that "the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Stuart*, 774 F.3d at 250 (quoting *Sorrell*, 564 U.S. at 572).  When a state defends a regulation on speech as a means to prevent harm, "[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (citations omitted).  Because H.B. 2 does not advance a substantial governmental interest, is not drawn to achieve the government's

interests, and prevents no actual harm, it fails under intermediate scrutiny and is unconstitutional.[6]

The Commonwealth asserts that H.B. 2 advances a number of substantial governmental interests, including the practice of medicine, the well-being and informed decision-making of pregnant women, and the protection of fetal life and discouragement of abortion. (D.N. 62-1, PageID # 1820-21, 1823, 1836; D.N. 32-7, PageID # 421) The Court finds, as have other courts, that these are substantial governmental interests. *See Gonzales*, 550 U.S. at 158 (recognizing a state interest in fetal life); *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997) (recognizing a state interest in maintaining "the integrity and ethics of the medical profession"); *Casey*, 505 U.S. at 871, 882 (recognizing state interests in fetal life, the psychological well-being of pregnant women, and informed decision-making); *Stuart*, 774 F.3d at 250 (same). But H.B. 2 still must directly advance the Commonwealth's interests and be drawn to achieve those interests. *Sorrell*, 564 U.S. at 572.

The facts here show that H.B. 2 does not advance the Commonwealth's interests and, in fact, acts to the detriment of those interests. As an initial matter, it is impossible to say that H.B. 2 is intended to better inform women considering an abortion when it also permits women to cover their eyes and ears in order to avoid receiving the information the Commonwealth intends for them to receive. Thus, even the plain language of H.B. 2 fails to advance the substantial governmental interests of the Commonwealth.

---

[6] The Commonwealth argues that if the Court finds H.B. 2 to be unconstitutional, the decision will render unconstitutional numerous other statutes that compel physicians to make certain disclosures. (D.N. 62-1, PageID # 1822–24) This argument is unpersuasive. Only H.B. 2 is under review by the Court at this time, and the Court will make no determination as to the constitutionality of the statutes cited by the Commonwealth. But the Court notes that those statutes require disclosures different in nature than those required by H.B. 2, and it is entirely possible that they do not infringe on physicians' First Amendment rights as does H.B. 2.

H.B. 2 also fails to serve the Commonwealth's interests because it appears to inflict psychological harm on abortion patients. (*See* D.N. 55, PageID # 699–701) *See Stuart*, 774 F.3d at 253 ("[F]ar from promoting the psychological health of women, this requirement risks the infliction of psychological harm on the woman who chooses not to receive this information."). The unrebutted facts adduced at the hearing show that women experience distress as a result of H.B. 2. (D.N. 55, PageID # 699–701; D.N. 41, PageID # 601–03) Requiring physicians to force upon their patients the information mandated by H.B. 2 has more potential to harm the psychological well-being of the patient than to further the legitimate interests of the Commonwealth. *See Stuart*, 774 F.3d at 253.

Nor can the Commonwealth demonstrate that H.B. 2 alleviates a "real, not merely conjectural" harm. *Turner*, 512 U.S. at 664. When the Kentucky General Assembly enacted § 311.725, its express purpose was to ensure that women made informed decisions when considering abortion. *See* Ky. Rev. Stat. § 311.710(4). Here, the Commonwealth argues that H.B. 2 is intended to ensure that abortion patients "possess[] sufficient information" to make their decisions. (D.N. 62-1, PageID # 1838) But there is no evidence that the existing law fell short of its goal, thereby creating a "real" harm to be remedied by H.B. 2. *Turner*, 512 U.S. at 664. When asked at the hearing whether the existing law was inadequate, the Commonwealth could not articulate specifically how or why § 311.725 fell short. (D.N. 55, PageID # 676–78) In its post-hearing brief, the Commonwealth asserted that it need not prove that the existing informed-consent law was inadequate. (D.N. 62-1, PageID # 1828 n.2) But this assertion ignores the burden placed on the Commonwealth under intermediate scrutiny. *See Turner*, 512 U.S. at 664.

The Commonwealth submitted several affidavits from women who chose to have an abortion but later came to regret their decision after realizing that they may not have been fully informed about the procedure. (D.N. 32-3; D.N. 32-4; D.N. 32-5; D.N. 32-6) While compelling, the affidavits are irrelevant; all of the affiants had abortions prior to the passage of the informed-consent laws preceding H.B. 2. (D.N. 55, PageID # 856-57) Thus, the record contains no evidence that Kentucky's existing informed-consent laws were in any way inadequate or left unresolved some "real, not merely conjectural" harm. *Turner*, 512 U.S. at 664.

Further, the Commonwealth's suggestion that H.B. 2 ensures that women are no longer "den[ied]" certain information is misleading. (D.N. 62-1, PageID # 1825 (citing *Lakey*, 667 F.3d at 579)) The evidence shows that it is not only the practice at EMW, but also the nationwide standard, to *offer* women the opportunity to see an ultrasound, hear a description of that ultrasound, and hear the fetal heartbeat. (D.N. 55, PageID # 694, 705, 813) There is no evidence that physicians in Kentucky were denying women this information prior to the enactment of H.B. 2.

To the contrary, Dr. Franklin's testimony shows that prior to H.B. 2, EMW patients made informed decisions about abortion and that the informed-consent process followed by EMW physicians ensured this. While Dr. Franklin's testimony also shows that EMW physicians complied with the existing informed-consent laws and have been complying with H.B. 2, there is no evidence that H.B. 2 has dissuaded women from choosing to have an abortion. (*See id.*, PageID # 690–94, 698–702, 726-27) Indeed, Dr. Franklin testified that in the nearly three months since H.B. 2 took effect, not a single EMW patient decided against an abortion as a result of viewing an ultrasound image or hearing an ultrasound description and the fetal heartbeat. (*Id.*, PageID # 722, 725–27, 729) Moreover, the evidence shows that H.B. 2 inflicts harm on patients

and physicians.  The Commonwealth has thus failed to meet its burden under intermediate scrutiny, and H.B. 2 is therefore unconstitutional.

**D.**

The Court will now address the motions for summary judgment filed by Defendant Attorney General Andrew G. Beshear and Defendant Michael S. Rodman.  Beshear and Rodman argue that they are not proper defendants to this action.  Having concluded that Beshear and Rodman are proper defendants, the Court will deny both motions.

Defendant Beshear argues that he is not a proper party because he has no authority to enforce H.B. 2.  (D.N. 58-1, PageID # 872)  This is the same argument submitted in Beshear's motion to dismiss.  (D.N. 13)  In the event that he is a proper party, Beshear submits a substantive defense of H.B. 2, arguing that it is constitutional on its face.  (D.N. 58-1, PageID # 872)  Because the Court has already determined that H.B. 2 is unconstitutional, the latter argument fails.

Nor is the Court convinced that Beshear lacks the necessary authority.  The attorney general is the "chief law officer of the Commonwealth" and has a statutory responsibility to

> exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment. . . . [H]e shall . . . commence all actions or enter his appearance in all cases, hearings, and proceedings in and before . . . courts, tribunals, or commissions in or out of the state, and attend to all litigation and legal business in or out of the state . . . in which the Commonwealth has an interest, and any litigation or legal business that any state officer, department, commission, or agency may have in connection with, or growing out of, his or its official duties, except where it is made the duty of the Commonwealth's attorney or county attorney to represent the Commonwealth.

Ky. Rev. Stat. § 15.020.  "It is unquestioned that '[a]t common law, [the Attorney General] had the power to institute, conduct[,] and maintain suits and proceedings for the *enforcement* of the laws of the state, the preservation of order, and the protection of public rights.'"  *Commonwealth*

*ex rel. Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009) (emphasis added) (alterations in original) (quoting *Commonwealth ex rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (Ky. 1974)). "Indeed, the Attorney General has not only the power to bring suit when he believes the public's legal or constitutional interests are under threat, but appears to have even the duty to do so." *Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016) (citing *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 618 (Ky. 1992) (Leibson, J., dissenting)). "And, notably, this 'broad grant of authority . . . includes the power to act to *enforce the state's statutes*.'" (omission in original) (emphasis added) (quoting *Thompson*, 300 S.W.3d at 173); *see also Johnson v. Commonwealth ex rel. Meredith*, 165 S.W.2d 820, 826 (Ky. 1942) ("It is generally recognized that unless denied by statute the attorney general of any state is clothed with . . . the powers . . . . to represent his state as its chief lawyer and to advise and speak for its several departments and officers in legal matters.").

From the above, it is fair to conclude that the Kentucky attorney general is empowered to enforce state law, unless that power is explicitly delegated by statute to another authority. The General Assembly has not expressly made it the duty of any other official to represent the Commonwealth in actions to enforce penalties under H.B. 2. Beshear cites no authority that expressly designates another official. Therefore, the Court can only infer that the official with the authority to enforce H.B. 2 is the attorney general. Beshear thus appears to be a proper party here.

Defendant Rodman, the executive director of the Kentucky Board of Medical Licensure, also argues that he is an improper party because he has no enforcement authority under H.B. 2 and no authority to take disciplinary action against a medical licensee. (D.N. 59-1, PageID # 884) Additionally, Rodman argues that Plaintiffs' injuries are purely hypothetical. (*Id.*)

28

H.B. 2 requires courts to report violations of the law to the Kentucky Board of Medical Licensure for disciplinary action. Plaintiffs describe Rodman's position on the Board as a "gatekeeper" to the disciplinary process. (D.N. 66, PageID # 1890) When the Board receives a grievance, the executive director assigns that grievance to an inquiry panel composed of Board members. Ky. Rev. Stat. § 311.591(2). If the panel determines that there has been a violation, the panel issues a complaint. § 311.591(3)(d). The executive director then assigns the matter for a hearing. § 311.591(5). This role is sufficient to name the executive director as a defendant, as he may be enjoined from initiating any inquiries or disciplinary hearings related to violations of H.B. 2.

Further, while it is true that Article III standing requires an injury, causation, and redressability, pre-enforcement review is permitted in some circumstances. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973); *Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne Inc.*, 332 F.3d 983, 988 (6th Cir. 2003). Potential adverse licensing actions, like those that could result from violating H.B. 2, are serious enough on their own to create a constitutional injury-in-fact to satisfy the justiciability requirements. *See Kiser v. Reitz*, 765 F.3d 601, 608-10 (6th Cir. 2014). Notably, in *Eubanks*, Judge Heyburn concluded that the plaintiff physicians could seek pre-enforcement review of the informed-consent law because "they *may* face disciplinary proceedings under the Statute." *Eubanks*, 126 F. Supp. 2d at 453 (emphasis added) (citing *Bolton*, 410 U.S. at 188). The same is true here. The executive director of the Kentucky Board of Medical Licensure at the time, C. William Schmidt, was named as a defendant in *Eubanks*. Here, Rodman is a proper defendant.

**IV. CONCLUSION**

The Court concludes that H.B. 2 violates the First Amendment. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Plaintiffs' motion for summary judgment (D.N. 60) is **GRANTED**. A permanent injunction and judgment will be entered this date.

(2)     Defendant Glisson's motion for summary judgment (D.N. 62) is **DENIED**.

(3)     Defendant Beshear's and Defendant Rodman's motions for summary judgment (D.N. 58; D.N. 59) are **DENIED**.

(4)     Defendant Beshear's and Defendant Rodman's motions to dismiss (D.N. 13; D.N. 14) are **DENIED** as moot.

(5)     Plaintiffs' motion for temporary restraining order (D.N. 3) is **DENIED** as moot.

(6)     The third-party motion for leave to file a brief as amici curiae (D.N. 18) is **GRANTED**.

September 27, 2017

**David J. Hale, Judge**
**United States District Court**